UNITED STATES DISTRICT COURT

DISTRICT OF OREGON


TROY LATRIAL RAMSEY,                                    Case No. 6:14-cv-01524-MC

        Petitioner,                                           OPINION AND ORDER

   v.

JEFF PREMO, Superintendent,
Oregon State Penitentiary,

        Respondent.
_____

MCSHANE, District Judge:

     Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging

that his counsel rendered ineffective assistance during trial. Respondent argues that petitioner's

claims were either denied in a state court decision entitled to deference or procedurally defaulted

and barred from federal review. For the reasons explained below, the petition is denied.

<u>BACKGROUND</u>

     In 1997, petitioner was charged with six counts of Aggravated Murder, three counts of

Robbery in the First Degree, three counts of Burglary in the First Degree, and one count of Felon

in Possession of a Firearm. Resp't Ex. 102. The charges against petitioner "arose out of a single incident in an after-hours gambling club," as recounted by the Oregon Court of Appeals:

> Defendant was playing a version of craps known as "four, five, six" with Antoine Levier and James Mayes. Defendant decided that Mayes was cheating and, depending on whom the jury believed, either used a gun to recover "what was rightfully [his]" from Mayes or sought to rob both Mayes and Levier. While defendant was either attempting to recover his money from Mayes or seeking to rob Mayes and Levier, the owner of the club, James Robinson, came up behind defendant with a shotgun. In the ensuing fight, defendant shot and killed Robinson.
>
> The state charged defendant with robbery, burglary, aggravated murder, and being a felon in possession of a firearm. Each of the three counts of first-degree robbery involved a different victim – Robinson, Mayes, and Levier. The three counts of first-degree burglary charged that defendant unlawfully remained in one of two locations with the intent to commit theft. Three of the six aggravated murder counts were based on a murder committed during the course of a robbery, and each count involved a different robbery victim. The three remaining aggravated murder charges alleged that defendant committed a murder during the course of a burglary and presumably corresponded with the three burglary counts.

*State v. Ramsey*, 184 Or. App. 468, 470, 56 P.3d 484 (2002) (*Ramsey I*); Resp't Ex. 106.

On December 14, 1999, after trial by jury, petitioner was convicted of all charges. Tr. Vol. 16 at 13-15; Resp't Ex. 146. The State sought the death penalty.

On January 11, 2000, after a sentencing trial, the jury found that petitioner should serve life in prison without the possibility of parole. Tr. Vol. 23 at 4-5. The trial court merged the six robbery and burglary convictions into the six related aggravated murder convictions and imposed concurrent life sentences without the possibility of parole; the court also imposed an 18-month concurrent sentence on the felon-in-possession conviction. Tr. Vol. 23 at 13-14; *see also Ramsey I*, 184 Or. App. 470-71, 56 P.3d 484.

Petitioner appealed and asserted that the trial court committed reversible error by failing to instruct the jury on a "claim-of-right" defense – that "using self-help to recover specific personal property is not robbery if the person has an honest claim of right to possess the

property." *Ramsey I*, 184 Or. App. at 472, 56 P.3d 484. Petitioner argued that he had a "claim of

right" to the money Mayes had stolen from him by cheating. Resp't Ex. 103 at 19-20, 39-40.

The Oregon Court of Appeals agreed, in part, and found that the trial court's failure to

give a claim-of-right instruction constituted reversible error with respect to the burglary charges

and the robbery and murder charges associated with Mayes and Robinson. *Ramsey I*, 184 Or.

App. at 475-77, 56 P.3d 484. The Court of Appeals explained:

> We begin with the robbery charge concerning Mayes. …According to defendant,
> he sought only to retrieve his own money from Mayes. Although other witnesses
> contradicted defendant's testimony and said that defendant also wanted to take
> money from Levier, defendant's testimony meets the "any evidence" standard ….
> If the jury found defendant's testimony credible, it could infer that he had a claim
> of right to the specific property that he was attempting to recover from Mayes
> when the shooting occurred.
>
> Defendant was also entitled to a claim-of-right instruction concerning Robinson.
> There was evidence that Mayes owed Robinson, the owner of the club, a
> percentage of the money that he won at the dice table, and that evidence was the
> apparent basis for the state's claim that defendant had robbed Robinson. If the
> jury found that defendant was not robbing Mayes but merely seeking to recover
> his own property, it could also find that he was not robbing Robinson. Robinson's
> robbery was, or could be, derivative of Mayes' robbery.

*Id.* at 473-74, 56 P.3d 484. Further, the Court of Appeals could not determine on which "intent to

commit theft" the jury had based its burglary verdicts and reversed petitioner's convictions on

these charges as well. *Id.* at 476.

However, the Court of Appeals found that petitioner was not entitled to a claim-of-right

instruction with respect to the robbery and murder charges associated with Levier:

> [Defendant] did not establish any basis for that defense as to Levier. At trial,
> defendant did not testify that he believed that Levier had cheated him. Similarly,
> no other witness said that Levier had cheated defendant. Although Levier won a
> substantial amount of money at the same table as Mayes and at the same time that
> defendant asserts Mayes was cheating him, there is no evidence that Mayes was
> conspiring with Levier. At most, one witness referred to an argument at the
> gambling table that may have involved Levier, but nothing in the record,
> including defendant's testimony, implicates Levier in cheating defendant.

> Because there was no evidence that Levier had wrongfully taken any money from defendant, defendant had no basis for asserting a claim-of-right defense to the charge that he had robbed Levier.

*Id.* at 474-75, 56 P.3d 484. The Court of Appeals remanded the case to the trial court for a new sentencing trial on the affirmed convictions. *Id.*

On remand, the State did not retry petitioner on the reversed convictions and did not seek the death penalty at resentencing. After a second sentencing trial, a jury again found that petitioner should serve life in prison without the possibility of parole. Tr. on Appeal at 2922.

In 2008, petitioner sought post-conviction relief (PCR) in state court. In his fourth amended PCR petition, petitioner asserted that trial counsel was ineffective by failing to obtain grand juror notes of Mayes's testimony and by failing to present evidence that petitioner believed he had claim of right to Levier's money. Resp't Ex. 124, Ex. 125 at 15-16, 18. The PCR court denied petitioner's claims, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. Resp't Exs. 156, 163-64; *Ramsey v. Premo*, 259 Or. App. 206, 315 P.3d 447 (2013), *rev. denied*, 355 Or. 317, 327 P.3d 1167 (2014).

On September 23, 2014, petitioner filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254. This Court subsequently appointed counsel, and on November 17, 2017, after several extensions and other procedural rulings, petitioner filed an Amended Petition.

## DISCUSSION

In his Amended Petition, petitioner alleges that his trial counsel rendered ineffective assistance by: 1) failing to "obtain records relating to James Mayes's testimony before the grand jury"; 2) failing to "present evidence that Mr. Ramsey believed that Antoine Levier had cheated him out of money, because that evidence would have provided a basis for a jury instruction on an honest claim of right defense; and 3) failing to "cross-examine David Knight, or call him to

testify as a defense witness, on his knowledge that Mr. Ramsey believed Antoine Levier, along with James Mayes, was cheating Mr. Ramsey out of money." Am. Pet. at 4 (ECF No. 91).

Respondent maintains that the PCR court rejected petitioner's first two grounds for relief in a decision that is entitled to deference by this Court. Respondent further argues that petitioner's third ground is a reiteration of his second ground and likewise was rejected by the PCR court. Alternatively, if this Court considers petitioner's third ground as a "new" claim, respondent argues that it is procedurally defaulted and barred from federal review.

A.  Grounds One and Two: Counsel's Failure To Obtain Mayes's Grand Jury Testimony and Failure To Elicit Testimony Regarding Levier

In his PCR proceeding, petitioner alleged that trial counsel was ineffective by failing to obtain grand jury notes relating to Mayes's testimony and by failing to elicit testimony from petitioner regarding his belief that Levier was cheating. Resp't Exs. 124, 160, 162. Respondent maintains that the PCR's court's rejection of these claims was reasonable and entitled to deference. I agree.

A federal court may not grant a habeas petition regarding any claim "adjudicated on the merits" in state court, unless the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" established federal law if it fails to apply the correct Supreme Court authority, or if it reaches a different result in a case with facts "materially indistinguishable" from relevant Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct legal principle but applies it in an "objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam); *Williams,* 529 U.S. at 407-08, 413; *see also Early v. Packer*, 537 U.S. 3, 11 (2002) (per

curiam) (state court decisions that are not "contrary to" clearly established Supreme Court law may be set aside only "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts'").

Under well-established Supreme Court precedent, a habeas petitioner alleging ineffective assistance of counsel must show that 1) "counsel's performance was deficient," and 2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, a petitioner "must show that counsel's representations fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Unless a petitioner "makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

1. Mayes's Testimony

The State called Mayes as a witness during its case in chief. On direct examination, Mayes testified that he saw the shooter fire two shots at Robinson, who fell to the right as the shooter moved to the left. Tr. Vol. 6 at 56-57. Mayes testified that he then saw the shooter come from behind a furnace and stand over Robinson, firing several more shots at Robinson as he lay motionless on the floor. Tr. Vol. 6 at 60 (testifying that the shooter "came out and he just boom, boom, boom"). In Mayes's prior statements to police, he stated that the shooter turned and fired at Robinson several times, either at once or in two quick bursts, then stepped over Robinson and ran out the back door.

During her cross-examination, petitioner's counsel asked Mayes whether he had ever told law enforcement officers that he saw the shooter stand over Robinson and shoot him.

Q:      Okay. You never told the detectives or you never told the police officer…
        that you talked to at the scene, you never told him anything about the
        young man standing over Mr. Robinson and shooting him? You didn't tell
        him that, did you?

A:      Yeah, he stood over and he shot.

Q:      But did you tell the police officer--

A:      Yes, I told the officers.

Q:      You told them that. Okay. And did you tell the detectives that, too?

A:      Yes.

Q:      Okay. So you think you told the detectives that he stood over him and shot
        him?

A:      No think to it. I told him he stood over and shot him.

Tr. Vol. 6 at 84.

Subsequently, petitioner's counsel elicited testimony from a detective indicating that

Mayes's trial testimony was inconsistent with his prior statements to the police. Tr. Vol. 8 at

183-88. Specifically, Detective Svilar, who interviewed Mayes shortly after the shooting,

testified that Mayes never mentioned to any police officer that the shooter stood over Robinson

and shot him several times.

Q:      And never once did [Mayes] tell you that the shooter stood over Mr.
        Robinson and fired boom, boom, boom into his body, correct?

A:      No, he didn't tell me that.

                                            ***

Q:      Okay. So Mr. Mayes had three separate conversations with the police….

A:      Yes.

Q:      Yes. All right. And none of those times did he ever tell the police that the
        shooter stood over the body of Mr. Robinson and fired directly into Mr.
        Robinson's body?

A:     He didn't tell me that.

Tr. Vol. 8 at 186-88.

To rehabilitate Mayes, the State called two members of the grand jury who testified that

Mayes's trial testimony was consistent with his grand jury testimony given two years earlier. Tr.

Vol. 9 at 12-20. Petitioner's counsel strenuously objected to the State's introduction of grand

juror testimony to rehabilitate a witness, and the trial court overruled her objections. Tr. Vol. 8 at

197-206; Tr. Vol. 9 at 3-9. During closing argument, petitioner's counsel addressed Mayes's

testimony and that of the rebuttal witnesses:

> One grand juror came in and told you that Mr. Mayes said four, maybe
> five shots over the body of Mr. Robinson. Another grand juror came in and…
> testified, "Shot in the head and neck, two, three, four times; once in the face, once
> in the neck, once in the chest."
>
> Ladies and gentlemen, all that shows those grand jurors coming in is that
> Mr. Mayes doesn't have any problem lying under oath. He will say what he wants
> to suit his audience.
>
> Now, Mr. Mayes tells you about that boom, boom, boom. You also know
> that he is lying because he never once told the police about this aspect that he says
> now happened in this case.
>
> He was interviewed at the scene by a uniform police officer....He was then
> at the scene with Detective Svilar who went back into the after-hours...with Mr.
> Mayes so Mr. Mayes could show him what happened....Never once did Mayes tell
> Detective Svilar that the shooter stood over the body and fired directly into the
> body of Phillip Robinson. Mr. Mayes then had an opportunity to talk with
> Detective Svilar later that day....And not once did he mention the shooter standing
> over the body of Phillip Robinson.
>
> And then a few days later, Mr. Mayes had an opportunity again to talk
> with detectives and again he didn't mention that. And use your common sense,
> think about that. That would be such a horrible thing to see. It would be the first
> thing out of a person's mouth, particularly at the scene where Mr. Mayes had the
> opportunity to walk through with Detective Svilar and show him right where the
> blood is still on the floor, and he doesn't do that.

Tr. Vol. 14 at 101-03. Counsel also argued that Mayes's trial testimony was inconsistent with the physical evidence and the testimony of the medical examiner. Tr. Vol. 14 at 103-06.

After the jury returned its verdict, counsel moved for a mistrial, arguing that the State's failure to provide grand jury notes regarding Mayes violated petitioner's constitutional rights. Tr. Vol. 17 at 4-6, 18. The trial court rejected this motion, finding that the issue was not "well preserved," that Mayes's testimony was "very difficult to predict," and that the testimony of the two grand jurors was not "that critical." Tr. Vol. 17 at 19-20.

In his PCR proceeding, petitioner asserted that counsel should have obtained notes of Mayes's grand jury testimony before she cross-examined him. The PCR court rejected this claim and found:

> Trial counsel was not ineffective in investigating Mayes testimony and cross-examining Mayes. Trial counsel had no way of knowing his testimony before the grand jury, which was confidential. Trial counsel did all she could to investigate his proposed testimony and, when she discovered inconsistencies between his testimony and his previous statements, she thoroughly impeached him.
>
> ***
>
> Even if counsel had received the [grand jurors'] notes in advance of trial, petitioner fails to demonstrate how the result of the proceeding would have been different. Counsel impeached Mayes on his prior statements to police. This issue was exhausted at trial and no additional evidence would have been presented to the jury had counsel had the notes in advance of trial.

Resp't Ex. 156 at 6, 9.

Petitioner argues that the PCR court's decision is not entitled to deference, because the court "failed to appreciate the true nature of the claim." Pet'r Br. at 41 (ECF No. 92). Rather than request the notes for impeachment purposes, petitioner maintains that counsel should have requested the grand jury notes to determine whether Mayes's trial testimony was inconsistent with his grand jury testimony. Despite the confidentiality of grand jury proceedings, petitioner

emphasizes that the disclosure of grand jury notes is permitted "when the testimony of a witness at a criminal trial may be inconsistent with his testimony before the grand jury." *State ex rel. Johnson v. Roth*, 276 Or. 883, 886, 557 P.2d 230 (1976); *see also* Or. Rev. Stat. § 132.220(1) (providing that a court may require a grand juror to disclose the "testimony of a witness examined before the grand jury, for the purpose of ascertaining whether it is consistent with that given by the witness before the court"). According to petitioner, if counsel had "known that Mr. Mayes's trial testimony was, in fact, consistent with prior testimony she could have targeted her cross-examination of Mr. Mayes differently" and avoided questioning him in way that allowed the State to call grand jurors as rebuttal witnesses. Pet'r Br. at 38-39.

To accept petitioner's argument would require this Court to view counsel's performance through "the distorting lens of hindsight," contrary to the Supreme Court's admonition in *Strickland. Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995). As the Court explained, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

From counsel's perspective at the time of trial, an eye witness had provided trial testimony that differed vastly from his previous statements to the police, and no evidence suggested Mayes had witnessed petitioner bend over and shoot Robinson as he had described. Presented with Mayes's apparent inconsistent testimony in the midst of trial, trial counsel chose to impeach Mayes with his prior inconsistent statements rather than speculate about his grand jury testimony and pursue an uncertain strategy to obtain confidential grand jury notes.

Given the circumstances, the PCR court did not unreasonably find that, from the perspective of counsel at the time, her choice did not constitute deficient performance.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (on habeas review, a state court decision "must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.").

Moreover, petitioner presents no persuasive argument that he suffered prejudice – that the outcome of trial would have been different had petitioner's counsel discovered Mayes's grand jury testimony before she cross-examined him. With knowledge of his grand jury testimony, counsel would have had three choices on cross-examination: 1) raise Mayes's grand jury testimony and his prior inconsistent statements to police and question his changing version of events; 2) not raise the grand jury testimony or his prior inconsistent statements and leave Mayes's trial testimony unchallenged; or 3) not raise the grand jury testimony and impeach Mayes with his prior inconsistent statements, which is the action counsel took. Had counsel decided not to impeach Mayes to avoid introduction of his grand jury testimony, the jury would have been presented with Mayes's unrebutted trial testimony that petitioner stood over Robinson and shot him several times. Had counsel chosen to raise Mayes' grand jury testimony along with his inconsistent statements to police – ostensibly to avoid grand jury rebuttal witnesses – the jury would have been presented with much the same evidence that was actually presented at trial: that Mayes's grand jury and trial testimony were inconsistent with his prior statements made to the police. As it was, counsel highlighted Mayes's inconsistent statements during closing argument to question his credibility and recollection of events, which is the only reasonable course of action counsel could have taken, even with the grand jury notes.

Accordingly, petitioner fails to establish that the PCR court unreasonably applied *Strickland* by finding no deficiency and no prejudice arising from counsel's failure to obtain grand jury notes.

2. <u>Testimony Regarding Levier</u>

On direct appeal, the Oregon of Appeals found that petitioner was not entitled to a claim-of-right instruction regarding the robbery and murder counts associated with Levier and affirmed those counts of conviction. *Ramsey I*, 184 Or. App. at 474-75, 56 P.3d 484 (concluding that "nothing in the record, including defendant's testimony, implicates Levier in cheating defendant"). Petitioner maintains that his trial counsel should have presented evidence – including testimony from petitioner –implicating Levier in Mayes's cheating scheme to support a claim-of-right defense on the affirmed convictions. Pet'r Br. at 2 (arguing that "counsel was ineffective when she failed to introduce additional available evidence in support of the defense to robbery and burglary," including petitioner's "perception of the events").

The PCR court rejected this claim:

> Petitioner fails to present any evidence that he had an honest claim of right to Levier's money. Because the Court of Appeals determined that petitioner was not entitled to the honest claim of right instruction based on the evidence he presented at trial, and because he fails to present any additional evidence regarding this issue, petitioner cannot prove that that counsel was ineffective in failing to present additional evidence regarding this issue.

Resp't Ex. 156 at 6.

Petitioner maintains that this finding was not reasonable because he "*did* present evidence that he had an honest claim of right against Mr. Levier" through his PCR deposition testimony. For example, petitioner was asked "what additional evidence could trial counsel have presented regarding Mr. Levier?" and petitioner answered:

> Mr. Levier and Mr. Mayes both had their money in the middle of the table, both were unwilling to come forward about what happened that night. Mr. Levier goes to another After Hours [after the shooting], so it may be fair to say Mr. Levier may well have been in on -- been in on it with Mr. Mayes in regarding to the cheating.

Resp't Ex. 153 at 40-41. Petitioner primarily questioned Levier's "unwillingness to come forward about what actually took place that night, and the reason he left, and the reason Mr. Mayes left as well." Resp't Ex. 153 at 41.

> And had Mr. Levier actually been robbed, why didn't he stay at the scene? Why did he leave in the first place? And if he wasn't in cahoots with Mr. Mayes, then why did he -- why was he so insistent on not saying that he left the table with Mr. Mayes, but that all the gambling was done before he even joined the table, when nobody else testifies to this but him. Everybody else said that they both left at the same time.

Resp't Ex. 153 at 41-42.

Notably, petitioner's PCR deposition testimony was based on facts discovered *after the shooting*, such as Levier's conduct after the shooting, Levier's lack of cooperation with investigators, and the testimony or statements of witnesses. Petitioner did not cite evidence showing that, *at the time he approached Mayes and Levier*, he believed that Levier was cheating or he was entitled to Levier's money. In fact, when asked at his PCR deposition whether it was "fair to say that you just don't know whether Mr. Levier took money from you?" petitioner answered, "No, I don't actually know. But I'm just saying from the way it looked they could have been in it together." Resp't Ex. 153 at 42. Accordingly, the PCR court reasonably found that petitioner did not present additional evidence to support a claim-of-right defense regarding the counts associated with Levier. *See* Or. Rev. Stat. § 164.035(1)(b) (in a prosecution for a crime involving theft, "it is a defense that the defendant acted under an honest claim of right, in that ...the defendant reasonably believed that the defendant was entitled to the property involved").

Petitioner also argues that counsel should have asked petitioner more direct questions about Levier to elicit testimony that petitioner believed Levier may have been cheating. Because counsel did not to ask petitioner those direct questions, petitioner maintains that the record failed

to contain sufficient evidence about his belief that Levier was cheating to support an honest claim-of-right defense. The record belies petitioner's argument.

During his direct and cross-examination, petitioner had numerous opportunities to testify that he believed Levier was involved in Mayes' alleged cheating. After counsel asked petitioner to tell the jury "What happened that night?" petitioner began recounting the events leading up to the shooting of Robinson. Tr. Vol. 10 at 35. Petitioner testified that he and Mayes were playing dice at the same table, and petitioner noticed Mayes was rolling the dice in a manner that he considered cheating.

> A:    So the first time [Mayes] put his money down, he rolled, but by him consisting of a roll, he rolls it kind of like off the top of his hands out of the cup. So the first time, I paid no attention to it, just thinking maybe he had did it on accident, he is not trying to get over on me, so I let him slide.
>
> We pay him off. We pay him his money. So a couple rolls later, he does it again. And by him doing it again, I said, "Hey, there's none of that going on at this table, man."

Tr. Vol. 10 at 40-41. Petitioner then testified that Robinson approached the table, whispered something in Mayes's ear, and Mayes left the table. Tr. Vol. 10 at 42. Counsel continued:

> Q:    All right. What happened then?
>
> A:    Then Mr. Mayes got up and left the table.
>
> Q:    Okay. And then what did you do?
>
> ***
>
> A:    So I ask [a friend] for his gun….After I put the gun in my waistband, I walk over to where Mr. Mayes was at and Antoine Levier, now that I know his name, and there was another older gentleman at the table which I don't know his name. So I walked over to the table and I asked him, "Hey, can I get my money back?" And he told me, he say, "Go on, youngster. Go on with all that."

I said, "Man, well, I ain't joking," and when I said, "I ain't joking," I
brandished a firearm at him. And by me saying I brandished a firearm, I
showed it to him at first.

***

Q:     I'll stop you there for a second, okay. When you were having this
       conversation?

A:     Yes.

Q:     Who you now know are Mr. Mayes and Levier?

A:     Yes.

Q:     Were they talking back to you?

A:     Yes. I never had a conversation with Mr. Levier at all. I had a
       conversation with Mr. Mayes.

Q:     All right. And what were you thinking? What was the issue for you?

A:     The issue was I just wanted the money back.

Tr. Vol. 10 at 42-45.

Despite counsel's open-ended questions and opportunities to tell the jury what the "issue"

was for him, petitioner did not testify that he believed Levier had helped Mayes cheat or that he

had a claim of right to Levier's money. As a result, counsel could not have been deficient by

failing to elicit testimony that was not forthcoming.

Accordingly, the PCR court's decision on petitioner's second ground for relief was

neither contrary to nor an unreasonable application of *Strickland*.

B.   Failure to Cross-Examine Knight

In his third ground for relief, petitioner again asserts that his trial counsel failed to

introduce evidence supporting a claim-of-right defense with respect to the counts associated with

Levier. Specifically, petitioner argues that counsel should have introduced the statement of

David Knight, a witness who was present at the after-hours club, indicating that petitioner had accused Mayes and Levier of being on the "same team" when he approached them. Petitioner maintains that if this statement had been in the record, the Oregon Court of Appeals would have found that petitioner was entitled to a claim-of-right instruction on counts associated with Levier and would have reversed those convictions as well. In support of this claim, petitioner submits three documents that were not presented to the PCR court: 1) a report prepared by trial counsel's investigator on November 22, 1999, memorializing his interview with Knight; 2) an affidavit from Knight signed on June 29, 2018, indicating he would have testified consistent with his statement had he been reminded of it; and 3) an affidavit from current counsel's investigator signed on July 8, 2018, explaining why Knight's affidavit could not have been obtained earlier. Pet.'s Br. Ex. 1 (ECF No. 92-1); Pet'r Exs. 2 and 3 (ECF No. 112-1).

Petitioner and respondent disagree about 1) whether this claim was raised in the PCR proceeding; 2) whether the claim is "new" or simply a reiteration of petitioner's second ground for relief; and 3) whether this Court may review this claim and the new evidence petitioner presents to support it.

Respondent maintains that petitioner raised this claim – the failure to adequately cross-examine witnesses – before the PCR trial court but not on PCR appeal, and it is therefore procedurally defaulted. Resp't Reply at 3-5 (ECF No. 103); *see* 28 U.S.C. § 2254(b)(1)(A) (a federal habeas petitioner must exhaust state court remedies); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) (a petitioner must "fairly present" his federal claims to the State's highest court "to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."). Alternatively, respondent contends that this claim is simply a reiteration of petitioner's second ground for relief based on evidence that was not developed

during the PCR proceeding and is not reviewable in this habeas action. Resp't Reply at 6
("petitioner's new claim is really a reassertion of Claim (b), supported with a new document"),
15-17; 28 U.S.C. § 2254(e)(2) (limiting review of new evidence to support a claim presented to
the state courts); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that the review of state
court decisions under § 2254(d)(1) "is limited to the record that was before the state court that
adjudicated the claim on the merits").

Petitioner maintains that evidence of Knight's statement places his second ground for
relief in a "significantly different and substantially improved evidentiary posture" so as to
establish a "new" claim excepted from *Pinholster*'s prohibition and the standards of review
under §§ 2254(d)(1) and (e)(2). Pet'r Sur-Reply at 2-3 (ECF No. 107); *Dickens v. Ryan*, 740 F.3d
1302, 1320-21 (9th Cir. 2014) (en banc) (explaining that *Pinholster*'s prohibition against federal
review of new evidence "applies only to claims previously 'adjudicated on the merits in State
court proceedings,'" and not to claims "fundamentally altered" by new evidence).

Petitioner concedes that this claim, if "new," is unexhausted and procedurally barred
absent a showing of cause and prejudice. Pet'r Br. at 28; *Dickens*, 740 F.3d at 1318 ("A claim
has not been fairly presented in state court if new factual allegations…place the case in a
significantly different and stronger evidentiary posture than it was when the state courts
considered it.") (citations omitted). Nonetheless, petitioner maintains that his default is excused
by PCR counsel's ineffective assistance in failing to introduce Knight's statement during the
PCR proceeding, and this Court may review the new evidence to determine whether PCR
counsel's performance was constitutionally deficient. *See Martinez v. Ryan*, 556 U.S. 1, 17
(2012) (holding that procedural default "will not bar" a "substantial" ineffective assistance of
trial counsel claim if post-conviction counsel rendered ineffective assistance by failing to raise or

develop the claim); *Dickens*, 740 F.3d at 1321 (stating that § 2254(e)(2) "does not bar a hearing before the district court to allow a petitioner to show 'cause' under *Martinez*").

Assuming without deciding that petitioner's third ground for relief is "new" and his new evidence is reviewable under *Martinez*, petitioner fails to establish that PCR counsel's ineffective assistance excuses his procedural default. In addition to showing the ineffective assistance of post-conviction counsel, "*Martinez* requires that a petitioner's claim of cause for a procedural default be rooted in 'a potentially legitimate claim of ineffective assistance of trial counsel.'" *Lopez v. Ryan*, 678 F.3d 1131, 1137-38 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 9). In other words, petitioner must demonstrate that his ineffective assistance of trial counsel claim is "a substantial one" and "has some merit." *Martinez*, 556 U.S. at 14.

According to petitioner's new evidence, on November 10, 1999, counsel's investigator interviewed and obtained statements from Knight, who was present at the after-hours club on the night of the shooting. Knight told the investigator that he and a companion decided to join petitioner and his friend at the after-hours club. Knight admitted that "he had been drinking" and "was intoxicated at the time," though he "remembered that everyone was losing money to an older guy wearing glasses." Pet'r Br. Ex. 1 at 2. Knight stated that the older man with glasses eventually left the table, along with another "taller older man," and the man with glasses began counting his money. Knight remembered petitioner yelling at "the two older men" and "accusing them of being on the 'same team'" before pulling out the gun. *Id.*

During his direct examination on December 1, 1999 – only three weeks after the interview with trial counsel's investigator – Knight testified that he saw petitioner approach an older gentleman who had been winning "most of the money" at the after-hours club. Tr. Vol. 7. at 55-57.

Q:      Do you recall a point in time when you observed something happen at the
        table that was near the table that you were at?

                                    ***

A:      What I seen is I just seen Mr. Beetlejuice and the character who was
        winning the money, I seen them talking loud and stuff.

Q:      Did you hear them say anything?

A:      No, I couldn't hear them say nothing.

Q:      Did you observe anything happening as they were talking?

A:      I seen a gun was pulled.

Q:      Now, who pulled that gun?

A:      Beetlejuice.

Q:      Beetlejuice being the defendant here?

A:      Yeah.

Tr. Vol. 7 at 57-58.

        On cross-examination, petitioner's counsel asked Knight whether people at the dice game

talked about cheating.

Q:      And was there any conversation back and forth or trash talking about
        being cheated or somebody was cheating at that table?

A:      It was like talking at the table. It was like -- I was drunk, so I couldn't hear
        what they was saying. I understood that they was getting mad at each
        other. It was talk because we do talk when we gamble.

Tr. Vol. 7 at 75. Petitioner's counsel also asked Knight about petitioner's interaction with Mayes

and Levier:

Q:      All right. And do you remember seeing Mr. Ramsey talking to the tall
        older man with the glasses at the other table?

A:      Yeah. I seen him and the other dude was at the table talking loud, and like
        I don't know, they was just talking loud. That's all I heard.

Q:      Okay. Would it appear to you that they were having an argument, a conversation?

A:      Yeah.

Q:      Okay. You don't remember what was said?

A:      No, I couldn't hear it.

Tr. Vol. 7 at 76. Counsel did not question Knight about his previous statement to the investigator and did not recall Knight as a defense witness to raise this issue.

Petitioner contends that counsel's failure to "refresh" Knight's memory about his statement to the investigator constitutes deficient performance because his testimony would have provided evidence to support a claim-of-right defense regarding Levier. I disagree and find that petitioner fails to rebut the "strong presumption" that trial counsel's decision was "sound trial strategy." *Strickland*, 466 U.S. at 689.

Based on the transcript at trial, counsel apparently was in possession of the investigator's report containing Knight's statements and utilized it during her cross-examination of Knight. *See* Tr. Vol. 7 at 79-80 (discussion between the trial court and counsel referring to a report of Knight's interview with counsel's investigator that had not been reviewed by the prosecutor). Petitioner does not present an affidavit from petitioner's counsel indicating why she did not ask Knight whether he heard petitioner accuse Mayes and Levier of being on the "same team," and petitioner does not present other evidence to show that counsel had no good reason to ignore the statement Knight provided to her investigator.[1]

---

[1] During her PCR deposition, one of petitioner's trial attorneys indicated that she presented all of the evidence she had to support the claim-of-right defense. Resp't Ex. 134 at 28-30. However, the investigator's report was addressed to petitioner's second trial attorney, who cross-examined Knight at trial. Pet'r Br. Ex. 1 at 1; Tr. Vol. 7 at 71.

Regardless, based on the record before the court, I find that counsel was not deficient by failing to introduce Knight's statement at trial, for the simple reason that Knight's statement directly contradicted petitioner's own testimony.

As noted above, on direct examination, petitioner did not testify that he accused Mayes and Levier of being on the "same team" or made any type of comment to Levier. Instead, petitioner testified that he spoke solely with Mayes and "never had a conversation with Mr. Levier at all." Tr. Vol. 10 at 44. On cross-examination, petitioner again was questioned about his interactions with Mayes and Levier:

Q:   Now, when you had walked over to this area where Mr. Mayes was and Mr. Levier was, were they sitting close to each other?

A:   No, there were sitting spread apart.

                                          ***

Q:   At the time they were there, is it true that they were counting their money?

A:   I can't recall if he was counting his money or not.

                                          ***

Q:   Who had money on the table?

A:   I don't know whose money it was.

Q:   Is it fair to say that there was money in front of both of them at that time?

A:   I can't say if it was both of theirs or not.

                                          ***

Q:   All right. So as you approached Mr. Mayes at the time…you had indicated that you lifted up your shirt and Mr. Levier was right there to you left, wasn't he?

A:   Yes, he was.

Q:   And you looked at Mr. Levier as well, didn't you?

A:     No. I didn't.

Q:     You never looked at him?

A:     I seen him, but I wasn't paying attention to him because my focus wasn't
       on Mr. Levier.

Tr. Vol. 11 at 41-44. Petitioner also testified that he "didn't take any money" from Mayes or

Levier.

Q:     You didn't take the money at all?

A:     No, I didn't.

Q:     Didn't put your hand out and grab it?

A:     No, I didn't.

Q:     Why is then, sir, that you turned to Mr. Levier and told Mr. Levier to give
       him your money?

A:     I never told Mr. Levier to give me nothing.

Q:     You never had any conversation with him at all?

A:     No, I didn't.

Q:     Zero?

A:     Zero.

Q:     Why is it Mr. Levier put all of his money on the table in front of you, sir?

A:     He said that he was counting his money from what I can recall.

Q:     He said that to you?

                                      ***

A:     No. I am saying when he came in here and testified, he said that he was
       sitting at the table counting his money. I wasn't paying attention to what
       he was doing at all.

Tr. Vol. 11 at 51-52.

In other words, petitioner's testimony was directly at odds with Knight's statement that petitioner accused Mayes and Levier of being on the "same team." Petitioner repeatedly emphasized that he confronted only Mayes about his money, never had a conversation with Levier, and was not "paying attention to" Levier. Petitioner was also insistent that he did not rob Levier (or Mayes for that matter) and did not attempt to recover money from Levier. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. In light of petitioner's version of events, trial counsel may have reasonably believed that introducing Knight's contradictory statement would hurt petitioner's case more than help it, particularly if Knight had made other statements inconsistent with that given to counsel's investigator. *See* Tr. Vol. 7 at 60 (prosecutor asking Knight, "Do you recall having a conversation with detectives in this case about what you actually heard [the night of the shooting], sir?").

Granted, in light of the Court of Appeal's decision, the risk of introducing Knight's statement might have been warranted. However, counsel cannot be tasked with anticipating a future ruling on appeal and this Court cannot view counsel's actions in hindsight. "*Strickland* does not mandate prescience, only objectively reasonable advice under prevailing professional norms." *Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th Cir. 2004); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (finding that counsel "cannot be required to anticipate decisions" in subsequent cases). Given the circumstances, trial counsel's failure to introduce a witness statement wholly inconsistent with her client's sworn testimony "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

Accordingly, petitioner does not overcome the "strong presumption" that trial counsel's conduct fell "within the wide range of reasonable professional assistance" in order to establish a

substantial claim of ineffective assistance. *Strickland*, 466 U.S. at 689; *see also Martinez*, 566 U.S. at 14. Absent a substantial claim, petitioner cannot "show that PCR counsel's failure to raise claims of ineffective assistance of trial counsel was such a serious error that PCR counsel 'was not functioning as the "counsel" guaranteed' by the Sixth Amendment." *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) (quoting *Strickland,* 466 U.S. at 687). Petitioner's procedural default is not excused, and he is not entitled to habeas relief.

CONCLUSION

Petitioner's Motion for Leave to File (ECF No. 112) is GRANTED, and the Amended Petition for Writ of Habeas Corpus (ECF No. 91) is DENIED. A Certificate of Appealability is denied on the basis that petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

DATED this  18th day of October, 2018.


s/  Michael J. McShane
Michael J. McShane
United States District Judge